The case on our call this afternoon is Agenda No. 10, Case No. 104-853, Robert N. Poindexter et al. v. State of Illinois et al. Mr. Young, are you ready to proceed? All right, you may proceed. May it please the Court and Counsel, I am Dwayne Young. I represent the plaintiffs in this action who prevailed in the trial court but lost by a split decision in the appellate court on the construction of a provision of the Medicaid Catastrophic Coverage Act passed by the Congress in 1988. It's a narrow question of law. It has to do with subparagraph B-2 of the Act, and the question is whether or not that Act, as passed by the Congress, prohibits the State of Illinois through its agencies from imposing a spousal support order in Medicaid cases where initially there's finding of eligibility because of both resources and income. Mr. Young? Yes. Not that it is dispositive of what we do in this case, but is it true that in the 20 years since the 1988 Medicaid amendments were passed, there's been no case law striking down state spousal support laws of this type? I find none. There is some reference in some cases dealing with excess resources, but there are no cases that I find anywhere dealing with this precise issue. And there are states that do have laws very similar to Illinois's. Is that correct? I am not aware. I've focused only on the Illinois law and the federal law, which I say preempts it. I just wanted to note those facts. Thank you. No, I didn't. Now, the issue, at issue, is the provision, subparagraph B-1, which the Supreme Court has referred to in the Bloomer case as the rule of subsection B-1. And in that case, it said, that rule is honored, for at no time is any income of the community spouse simultaneously deemed available to the institutionalized spouse. What the MECA, and by that I mean, of course, the shorthand for the Medicare Catastrophic Coverage Act, what the MECA intended to do was to correct what the Congress referred to, or the courts also, as an unintended consequence of the original Medicaid law, which deemed all of the income of both spouses, both the institutionalized spouse and the community spouse, as available for the care of the institutionalized spouse. When the MECA was passed, part B-1 expressly says that during any month that the institutionalized spouse is in the institution, no part of the income of the community spouse shall be deemed available for the care of the institutionalized spouse. And the question here simply is, is there any wiggle room for the state to go beyond that? The MECA starts out with the blanket statement that all other provisions of subchapter 19, which is the Medicaid Act, are superseded if they're inconsistent with the provisions of the MECA. So we start with that very broad generalization. The language then respecting the income of the community spouse is also very broad. It says during no month is any part of the income of the community spouse deemed available. It's our first position is that that couldn't be clearer, and that that should end this case. But the state of Illinois has gone beyond that, saying that, look, their position is that that only has to do with initial eligibility. But the MECA addresses both continuing eligibility and availability of medical assistance to the institutionalized spouse, both with respect to income and with respect to resources. The state seems to rely on subparagraph A-1, which begins with in determining the eligibility for medical assistance of an institutionalized spouse, and then everything after that follows from that, and therefore the language of B-1 still refers to eligibility. How do you respond? That's at least my understanding of the state's argument. Well, B-1, the income is treated a little bit differently than the resources, but B-1 deals with not only initial eligibility because it refers to any month. And that's the phrase that keeps getting lost. And even in the majority opinion of the appellate court, usually that provision is referred to. Those words are left off. But this doesn't say for initial eligibility. It just says in determining the eligibility. That's correct. And eligibility for Medicaid is a monthly proposition. And so technically, although they don't review it and redetermine it every month, it's done annually, if there's a change, if the institutionalized spouse dies or the community spouse dies, then it's good through the following month, through the end of the month by definition. Now, the question before this court is whether or not the MECA, as passed by the Congress, was intended to supersede this sort of indirect appropriation of community spouse's income for the support of the institutionalized spouse. And we submit that under the Bloomer case, which has been construed, which did construe the MECA, and it's obviously the great weight of authority here, the United States Supreme Court did make reference to the preservation of the subsection rule, the rule of subsection B-1, which addressed the availability of the income of the community spouse for the care of the institutionalized spouse. That Bloomer referred to as a key prohibition of the MECA. And that expressed language refers to any month, not just the initial month of eligibility. The rules promulgated by the Secretary, which we've reproduced, the applicable rules in the appendix, are completely in accord. And those rules are replete with the language at the commencement of many of the sections that say irrespective of state law. Nowhere is there any suggestion by the Secretary, as there was in the Bloomer case, as to whether you start with an income or an asset approach to approach eligibility. Nowhere has the Secretary indicated that, well, we're going to leave it up to the states to go either way, or that they can do that. There's just no suggestion. And I think the phrase used by the Supreme Court was latitude accorded by the Secretary. There is no such suggestion anywhere that the Secretary has deferred to this kind of an issue for the states. So the regulations are in complete accord with the plain language of Section B-1. And what happens, I think, is because there is an occasional spouse, as there was in pre-MECA. Under that situation, if the assets were in the name of one spouse, the other spouse was immediately eligible. That was one of the unintended consequences that was addressed. But everything else, all income, and if assets were held jointly, all of them had to be spent down to zero or down to the eligibility amount under those circumstances. Now, using an occasional example of saying, well, okay, the MECA provides for a minimum income and even a diversion of income from the institutionalized spouse to the community spouse under certain circumstances. It does set a floor, and income can be diverted. But there is no maximum set anywhere under the statute saying, look, over so much income, you've got to start paying a portion of it for the support of your spouse. It does not address that. And so what really happens is there may be some cases that seem to be offensive to some. There's kind of a creeping determinism that means that, hey, we've got to stop some of these, maybe some cases that I deem excessive. But my position is, and I think it's correct, as this Court stated in the Hines case, those are issues of policy for the Congress to address. If the Congress is offended that there are some occasional cases where the income allowed to the community spouse exceeds what they believe to be prudent, then it's up to the Congress to address, not for the Court to supply a maximum amount under those circumstances. We believe that Judge Kinect said it well, that it's really not for the courts to set the policy, but it's for the courts simply to enforce the policy set by the legislature so that any change should be supplied by the Congress. It is also true, and this has to do with the state's argument that by policy there ought to be some limitation set. The MECA also makes it very clear in Paragraph C4 that resources, once eligibility is determined, can disguise the limit for the community spouse. The community spouse can win the lottery the next day, and they're untouchable under the Medicaid law. The community spouse is entitled to grow her assets to whatever she can after eligibility is determined. That couldn't be plainer. And so it's our position that the MECA is consistent in that it provides for preservation and protection of not only the income, but the resources of the community spouse once the eligibility has been determined. There are cases that refer to support rights, and actually the MECA itself refers to support rights, but those are in the limited circumstance under which there is what's called, you know, it's come to be known as spousal refusal cases where the community spouse says, look, I will not participate in the process and I will not disclose my assets. The MECA makes it clear the institutionalized spouse is still entitled to coverage there, but the state can pursue those excess resources under the spousal support assignments which is required under the MECA. And if you read carefully, the cases that the state uses, the Marin's cases, the Spellman cases, those are spousal refusal cases. Every single one of them have to do with going after excess resources, not after any kind of notion of excess income. And the seeking of the support is under the spousal support provisions of the MECA itself, not the general support provisions of Title 19. There's no express preemption clause in the MECA, is there? Well, I think there is. I mean, it says a couple of places. First of all, it says that the MECA will supersede all other contrary provisions of the act itself. And it also refers to, let me just find that real quickly. It's the provision of which it's Section 1396 AF, which is the provision under which some states early on, and Illinois was one of them in 1970 with the advent of the Medicaid Act, could elect under what was called 209B provisions to opt out of some restrictive provisions. But the MECA expressly overrides the regulations of 209B states by the reference of 1396 AF, which is the corresponding provision of the old 219. The 219 was just a term of art used to refer to the states that had elected originally under Medicaid law to opt out of some of the more restrictive provisions. But MECA is very clear that it overrides that, as well as overrides any inconsistent provisions of itself. So you're taking a global view of the entire statute, not just basing it on B-3? Correct, but at issue before you is simply B-2, as to whether or not the court can impose a support right. And it's our position that expressly it cannot, that this has been preempted by federal law and by the very terms of MECA itself. Again, I think the language of the Supreme Court in the Bloomer case says, thus, at all times the rule of subsection B-1 is honored, for at no time is any income of the community spouse simultaneously deemed available to the institutionalized spouse. It seems to me that that interpretation given to the MECA is real clear, that you cannot access the income of the community spouse for the support of the institutionalized spouse during any month. The shift of income allowed by MECA is only to provide the community spouse with what is statutorily known as the community spouse minimum monthly maintenance needs allowance. The Supreme Court in Bloomer referred to it as the community spouse monthly income allowance, which allows diversion of income which is otherwise payable to the institutionalized spouse to be diverted to the spouse at home. The current rate is somewhere around $2,600 a month. It sets no cap. There's no provision beyond that. So, as we mentioned in our brief, this court has fairly recently decided the Hines case, which I think from a statutory construction has done a masterful job of dealing with the approach that the court ought to take with construing this statute. In the Hines case, it was determined because state law didn't comply with federal law, which allowed an expanded version of the definition of an estate, that the estate could not recover from a community spouse even after her death. In this situation, unless the appellate court decision is reversed, we have the strange situation where a community spouse is liable for support during her lifetime, but not after her death, which I think flies in the face of the purpose of the mecca in the first place, and that was to do away with the unintended consequence of pauperization of spouses. Now, really, I think what the state is really complaining of is something in the nature of hindsight bias, saying, well, there are some cases here that people just shouldn't get by with, and pointing to one or two that may have had a spike of income, that that just shouldn't be allowed. But that's not the issue before this court we respectfully submit. That is for the Congress to decide. The Congress having set no ceiling, I think the state is responsible to abide by the federal law and that the matter has been preempted expressly by the Congress, but also otherwise because of the regulations promulgated by the Secretary of the State Medicaid Manual, which is the Secretary's directives to the states on how to operate Medicaid law. Those regulations are all in accord, and if you read through those regulations, they are replete with the phrase, irrespective of state law, irrespective of state law. So we submit that it's been not only expressly preempted, but otherwise, and that the Congress, in having acted, usurped this whole area, and that the trial court's decision ought to be reinstated and the appellate court reversed. And that's what we would ask you to do. Thank you. Thank you, Mr. Young. Mr. Ehlitz. Good afternoon, Your Honors. Illinois Assistant Attorney General Carl Ehlitz, appearing for two state agencies this afternoon, the Department of Health Care and Family Services and the Department of Human Services. These agencies act together to administer the Medicaid Act in Illinois. I want to start by referencing something that is in Mr. Young's brief. He says that we didn't file a cross petition for relief, and so we're forbidden from bringing up the argument that the plaintiffs failed to exhaust their administrative remedies. My response to that is very straightforward and short. Supreme Court Rule 318A says that an appellee may seek and obtain any relief warranted by the record. This is something that was argued extensively in the appellate court and was preserved below in a motion to dismiss. It's in the record. We didn't have to file a cross petition. Also, Mr. Young argues that we should have filed or at least made a notice under Supreme Court Rule 315H. We are not seeking cross relief. We are not seeking to have the appellate court's judgment changed in any way. We are simply offering the court an alternative ground for affirming the appellate court's decision. So I don't believe we had to file anything under Supreme Court Rule 315H either. That puts at issue a second argument, which Mr. Young hasn't addressed, which is whether the plaintiffs have exhausted their administrative remedies. I don't expect your honors took this case to have a technical argument about that, but I want to spend at least some time discussing that because we feel very strongly that this case should have never really gotten past the complaint stage. There are nine plaintiffs here. The easiest arguments I have are with regard to six of them who never received final administrative action. They received letters asking them to provide information about their income. These six plaintiffs simply refused this. And this court has precedent which we think is on all fours on that particular question, which is the National Marine case, 1994 case I believe, where the court made it very clear that when you're not faced with an agency final action, you can't bring any sort of relief in the circuit court. So those six plaintiffs we think should be dismissed out on National Marine, on the grounds of National Marine. The other three plaintiffs did get final orders from the Department of Human Services. They were told to pay spousal support. My complaint with regard to those three is that they never sought relief at the agency level that they were entitled to, which is a hearing and then an opportunity to have the results of that hearing confirmed by the director. I know that they suggest that this would have been fruitless, pointless, that this is a question of law, that the courts were going to review it de novo. But the agency does have a statutory, rather an administrative provision, governing the type of argument he's making, which is that if you have a low enough income and you're a community spouse, the state can't do this. That is Administrative Regulation 103.10a. He was free to argue at the agency level that that administrative regulation was not broad enough and should be expanded. And then the agency could have considered that, made the appropriate record. I know there's been a lot of suggestion, certainly below, I suppose, in the appellate court brief that there was no point to having an administrative review here because it was a pure question of law. But the fact that the agency already has a regulation suggests that that's not really true, that he could have made the opportunity. Now, the other argument that was made below is that we know what the state's position would be, so what's the point? But we know what the state's position would be only here after we've litigated through the circuit court and through the appellate court. So I want to urge the court to look strong and hard at the exhaustion argument. They also, these three plaintiffs, also did not seek, because they hadn't gotten final judgments from the director, they would have allowed the opportunity to bring circuit court review under the administrative review law. So it's our position that those three plaintiffs double faulted. Turning to the merits, Your Honors, I think the case, the center point of the case, has to do with the words of the statute deeming income. It's important to understand what deeming is. Deeming is a term of art used by the Medicare Act in the eligibility context regarding the assumption that income or resources are available whether or not they actually are. Deeming income, deeming resources, is sometimes very unfair because it means the state is assuming someone has the ability to make a payment when they really don't have it. And so Congress recognized that this deeming was a problem under the Medicaid Act as it was originally promulgated and passed the MCCA. And I agree with my opponent that one of the concerns Congress had in passing the MCCA was to prevent the pauperization of community spouses because the states were deeming income that wasn't really available. With regard to the preemption question, Your Honor asked about whether there was any provision in the Medicaid Act saying that it preempted state law. There is no provision that I know of. There is no provision, actually. I don't want to say that I know of. I'm sure there's no provision. The idea that there's field preemption here is, I think, rather silly. The Blummer case is very clear. The U.S. Supreme Court's decision in Blummer goes on and on about how Medicaid has always been a cooperative federal-state program. There's definitely going to be an interplay between federal and state law. So the idea that Congress has preempted the field here is simply untenable and the Court should quickly reject that. I've just said that there's no express preemption in the Act. I think that's almost certainly true. Although my opponent, Mr. Young, does focus on language appearing at the beginning of the MCCA, Section 1396, R5a and b. And I'd like to sort of turn to that and just point out that the language used there, I think actually does support the state's position, not the plaintiff's position. It says, in determining the eligibility for medical assistance, that's the beginning, Section 1396a. It's eligibility we're talking about. It's not things that happen after eligibility. In Section b, it says, as he points out, during any month in which an institutionalized spouse is in the institution, and later it says, no income of the community spouse shall be deemed available to the institutional spouse. Again, this word deemed. This has to do with determining a person's eligibility. Now- Excuse me, Counsel. Yes. Your opposing counsel said eligibility was at every month. Yes, and that's my next point, Your Honor. It was a light bulb when I read the Supreme Court's brief that went off, because in the appellate court I didn't really understand this. And I realized after later when he explained it, and I think he's explained it properly, eligibility in Illinois is a monthly process. So when Congress says, during any month in which an institutionalized spouse is in the institution, no income of the community spouse shall be deemed available, the concern Congress had there was that the states in subsequent months would say, ah-ha, we're going to deem income now. And the states wanted to make it sure that there wouldn't be deeming done with regard to eligibility. Not just initial eligibility, but that there's a review, and as I understand it, it's every year. But when they do the yearly review, they look at each month. So if someone has had a change of financial status in a given month, they can lose their eligibility for that month. Section 1396R5B talks about eligibility as a monthly thing, because it is a monthly thing. It is not something that's just, there's initial eligibility determination, but there's also ongoing eligibility that goes month to month. And so we think that actually dovetails nicely with everything else we've argued. That deeming is the key here. I just may not be getting it, and that's a real possibility. I understand that. But I'm looking, trying to just look at the words of B1. During any month in which an institutionalized spouse is in the institution, no income of the community spouse shall be deemed available to the institutional spouse. And I just, I'm having a hard time looking at the plain language and determining that it means anything other than the institutionalized, the money of the community spouse, the income of the community spouse, will not be available to the institutional spouse to pay the medical bills that are. Your Honor, it says shall not be deemed available. And deem is this term of art. Word of art. I guess that's. Yes, it's the idea that the department. I'm sorry. Sure. I mean, I absolutely believe that there's a basis for you saying that. But I have no idea what the basis is that this deem is a word of art. Is this out of the regs or out of case law? Your Honor, I don't know. It certainly appears in the Medicaid manual. There are references to what deeming means. That's the federal government's agency that tells the states. Is it deeming or deemed? Is there a difference between those two words? Your Honor, I don't remember whether it's deemed or deeming. But deemed is certainly defined by the Medicaid manual in this way. In fact, when I said to the court this morning, when I read out what deeming was, I took that from the Medicaid manual's language. This assumption in the context of determining eligibility, it's deciding whether income can be used to disqualify someone even if they don't have it. Your position is all this is saying is in this monthly reevaluation, you can't consider the income of the community spouse. In determining that person's eligibility. In determining eligibility for another month. Yes. And this is the point that I think is so critical, Your Honor. We're not denying eligibility here to anyone. Mr. Young is correct. Can I ask another question? Sure. Of course. But without this statute, income could never be used to determine eligibility. Is that accurate? Well, we're talking about income of the community spouse and the eligibility of the institutional spouse. Only in a case where all the income goes to the community spouse and that's the name on the check and whatever else. Yes. In the old system, before the MCCA was passed, what would have happened is the state would say, well, community spouse, you have a very large income and we're going to assume that you're providing for your spouse. So your spouse is not eligible and if it were a husband and a wife and the wife was the institutional spouse, the wife will not get coverage. And that's one of the things that Congress was very unhappy about, that income was being deemed to the institutionalized spouse, even though it was income that was coming to the community spouse. So Congress said in B-1, don't do that, states. And if you just bear with me. Sure. It says more than just deemed, though. It doesn't say deemed to the institutionalized spouse, which I guess is the word of art. It says, the statute does, deemed available to the institutionalized. Yes. Well, available is also one of the provisions of the Medicaid Act about what can be considered available and the states consider things available by deeming them. And so those two words are often together. But it really is critical for me to convince Your Honor that this is not about. Your opponent may not agree with you. I think he may, actually. Because we're disagreeing fundamentally about this, obviously. I'm just trying to figure out what the words mean. That's all I'm about. Well, deeming, and I know there's at least one case, because I'm sure I cited it in my brief. Deeming is a term of art. The courts have recognized it as a term of art. And it means assuming income is available to someone, whether or not they're actually going to get it. And this is another important point, in the eligibility context. We do have, isn't there a term like initial eligibility? Congress does talk about initial eligibility. In which an evaluation is made of the resources to see if any of those resources are available to the institutionalized spouse. Yes. And that after that initial eligibility, even on these monthly basis, you don't reevaluate the resources. Yes, that was a point he made when I presented his side. He said that whether a community spouse won the lottery, that would not be something that the state could use against the institutionalized spouse. I quickly checked the statute. I think he's right about that. But that's not income. And B-1 is about income. The statute makes a distinction, a very clear distinction, between resources calculation and income calculation. How does the portion of B-1 that reads, during any month in which the institutionalized spouse is in the institution, affect, if at all, your eligibility argument? I think it actually bolsters the eligibility argument. That's the point I made. But I didn't realize this until I read Mr. Young's Supreme Court brief when I realized, oh, yes, he's telling us that this is an ongoing process. So the fact that Congress has said this. That's what you were saying earlier, to say it's not only the initial month, it's every month that's looked at to determine eligibility. Yes, Your Honor. And there's been a lot of aha moments here because that was one of them. But in the subsequent months, the evaluation is different, isn't it, than it was initially? There are places where Congress has said, don't do this except for the initial month. What does post-eligibility mean, which we also see in the statute? Your Honor, you'd have to show me where it says post-eligibility. I can't talk about it so abstractly. I apologize. I'm not able to do that. It's a complicated beast. I've noticed. Well, that's my question, if I may. This whole section that you've been talking about, during the any month, that's the B1. There is a provision buried in the middle of that sentence. It says, except as provided in Paragraph 2. When you go to Paragraph 2, that's the category that says attribution of income. And in A2, it talks about for purposes of determining the income of the institutionalized spouse, the community spouse, for purposes of post-eligibility. And then that refers us to Subsection D. And then Subsection D is labeled protecting the income for the community spouse. And my question is, when you weave your way through these references, that specifically talks about how much of the spouse's income, that's the community spouse, is to be applied monthly to the payment for costs of care in the institution. And then it has these allowances, personal needs, community spouse, income allowance, family allowance, medical care expense allowance. Isn't the answer in that provision? Well, yeah, I hope I can answer that. I mean, is that in your brief? Yes, Your Honor. We certainly want to talk about Part D. Part D is the section, 1396R5D, is the section where Congress made allowances of concern, showed concern for the community spouse's income. And since that's what this case is about, I think we need to talk about D. Part D deals with the concern that Congress had about people whose income was too low. It doesn't talk about people whose income is too high. I think it's silent about that. It makes it clear that if the community spouse's income is below 150% of the poverty level, which at the time of this case was about $2,400, if the community spouse doesn't have that level of income, the states must make allowances. And the way it works now is income that comes to the institutionalized spouse, instead of being taken as part of her spend down, will be diverted to the community spouse. And if that's not enough, I believe it's still the law, although I may be wrong, but I think it's still the law that initially, at the initial level, they could make some changes of resources as well as income. But in any case, this provision is the place where Congress talked about income and the community spouse. And the only thing Congress said to the states in Part D is, Thou shall not, you know, make laws that don't give the community spouse 150% of that $2,300 a month I had mentioned. And it's significant, as the appellate court pointed out in its decision, that this congressional section talks about minimum income allowances. As long as Congress is assured that the community spouse has a minimum income of 150% of the poverty level, then we've met, the state of Illinois has met the requirements of MECA. And then the question is, well, okay, now what? We've met our MECA obligations. We've got our eligible spouse eligible. We've got our community spouse with sufficient income. Does that person then not have any more financial responsibility for his spouse? And the state has taken the position that a person who has an institutionalized spouse is still financially responsible for that spouse. It's not that they don't have some benefits by Part D, this 150%, but they have to also meet the requirements of Illinois law to the extent they can. I want to make a point about Table A that's in the back of my brief. That's where the state tries to collect spousal support. It is a table which only tries to take approximately 1% of annual income per month, about 12% a year of gross annual income. That's all the state is looking for in this case. That's far below what the state is paying to keep institutionalized spouses in their nursing home. If we were to rule in your favor, there would be no limitation, such a necessary limitation. The argument, I think, logically the state has to, my argument has to be that the state cannot go below, cannot allow a community spouse to go below 150%. And that's the only real restriction. That's the restriction Congress insisted on, and that's the restriction that we're meeting in this case. The 12% in the appropriate case could become 50% pretty easily. There would have to be a change in the administrative regulation. And, of course, we have to be very careful not to invade what Congress said was the minimum monthly income allowance for the community spouse. But, yes, Your Honor, I think that's right. I suppose I want to just finish by saying that the dissent in the appellate court was critical of my argument, saying that we had argued policy and if the strict language of the statute required a result, the policy shouldn't matter. I didn't argue policy, though. I tried not to anyway. I think the answer in this case is in the language of the statute, of course, in the underlying principles that govern it, because this is a preemption case, so the court has to tread slightly differently in a preemption case, has to show a little more concern for the intent of Congress. But the policy arguments I make are that it just happens to be good, we get a good policy result if the words are read the way I think they should be read and it's not an absurd result. We have plaintiffs here, some of whom have six-figure incomes, who are claiming they don't have any obligations to support their spouses. That's just not a reasonable position to take because we all know that the Medicaid statute was designed to benefit the state's very poorest people. It's just not a program designed to provide medical benefits for people of anything but the poorest level of income. It's not a retirement program for people so that they can be better off. It's not a program that ever tries to assist people in passing income to their children. These are all things that Medicaid tries not to do. We get an absurd result, I think, if we follow Mr. Young's arguments, and I'd ask the court to affirm the appellate court. I asked Mr. Young this question. I'm not sure I got a direct answer, and I'm not sure you covered it, but 1396R5 is the section we're dealing with, and A1 starts with determining the eligibility for medical assistance of an institutionalized spouse. The provisions of this section supersede any that's implied. It seems to me all of the subsections are part of this, and the entire section deals only with the issue of eligibility. Yes, I think that's right, Your Honor. And this doesn't say state law is preempted either. It says other provisions of the Medicaid Act. So state law is outside that. I'll make one quick point, Your Honor. Can I make it? I want to back off ever so slightly from reliance on the Spellman decision. I've argued that it was directly on point on all fours. I think that's probably too far. I understand Mr. Young's point now, which he's been making all along. It's another aha moment. Spellman really was about collecting resources. However, if you read it carefully, there's lots of what I think is reasonably considered as dicta about income suggesting this result. It's been there for 20 years. It's undisturbed. I think the court, if you read Spellman, I think I have to concede it's not really about income collection, which is the point he made, but I think it's still very helpful to the court and does set the right tenor for how this case should be decided. Is the same true of Moran's then? Moran's, I believe so, yes. That is also. It's a resource case as well. I believe he's correct when he says that, yes. So we ask that the appellate court's decision be affirmed, Your Honor. Thank you very much. Thank you, Mr. Realist. Rebuttal, Mr. Young? Briefly, and first of all, the point about deeming. What deeming is is I take a sign and I paint on it cow, and I hang it on my dog and say deem my dog a cow. That's what it means. And I readily admit there are times when the law does this, vicarious liability, agency, those kinds of things. But in this particular instance, as Mr. Justice Kilbride noticed, in the middle of that section it refers to subparagraph 2, which is the codification of the name on the check rule. The old rule was if either spouse's name was on the check or the asset, the income, it was deemed the institutionalized spouse's check. The mecca codified the name on the check rule. If it says spouse A or spouse B, the rule says divide it in half. If it says spouse I for the institutionalized spouse, it's going to be deemed his or hers. And if it says community spouse on it, then it's deemed hers. That, I think, ends that argument. The old deeming rule where income of either spouse was deemed the income of the codification of the name on the check rule, which is really the refinement of the rule of B-1. Secondly, with respect to the exhaustion issue, I think the appellate court treated that appropriately and carefully and correctly in the recent case of Cannell and Topinka that this case decided in the landfill cases which we put in our reply brief. I trust we'll cover those things because we are dealing here with strict statutory construction. That's reserved for the courts. And we're dealing with the issue of presumption, which is a constitutional issue. That's reserved to the courts. The agencies have no particular authority or expertise in that area. And I would respectfully ask that the court affirm the appellate court in that regard. Mr. Young, if I may. Yes. You made reference to my question before. When you go to Paragraph 2 that you acknowledge the no check of the rule codification, it does then send you to this, what Mr. Ellis referred to as Part D, Section D, protecting income for community spouses. My question to him was, isn't the answer on income to be used, attributed, whatever, isn't it found in that part? It is. But what it leads you into is what he acknowledges is the Congress intended that there be the minimum. But they never set a maximum. So I think we all agree that income can be diverted from the institutionalized spouse to the community spouse to make sure that the community spouse has at least the minimum. But there is no maximum. Well, then what does it mean in that section when it says, in determining the amount of the spouse's income, that's the community spouse, that is to be applied monthly to payment for costs of the care in the institution. What does that mean? What subparagraph are you referring to? That's the D1, protecting income for community spouse. One is allowances to be offset from income. I'm in the appendix to the estates brief. I don't know if that's where you are. Page A8. Yeah, those has to do with the income that can be diverted from the institutionalized spouse for exempt purposes, including supplementing the income of the community spouse. I'm going to do a quick read on it. But doesn't the second line say the amount of the spouse's income? That's the community spouse. I read that as being the institutionalized spouse because that's what the whole section refers to, allowances to be offset from the income of the institutionalized spouse. That's the heading. I know, but it's also the subparagraph underneath D that says protecting income for community spouse. And those allowances in A, B, C, and D talk about community spouse allowance, medical care, remedial care. Right. The first allowance is the personal needs allowance. Right. And the second allowance is to divert the income to the community spouse. I'm not suggesting by my question that I figured this out. No, I understand. I confess to being a little puzzled now, and I didn't.